**Nasbah C. Yazzie, Appellant,**

v.

**Edward Nelson Catron, Appellee.**
**Decided July 20, 1992**

## OPINION

Before AUSTIN, Acting Chief Justice, BLUEHOUSE and SLOAN (sitting by designation), Associate Justices.

James Jay Mason, Esq., Gallup, New Mexico, for the Appellant; and Samuel Pete, Esq., Shiprock, Navajo Nation (New Mexico), for the Appellee.

Opinion delivered by AUSTIN, Acting Chief Justice.

Nasbah C. Yazzie (Yazzie) appeals an Order of the Window Rock District Court establishing the eastern boundary of Edward Nelson Catron's (Catron) livestock grazing use area. We hold that Yazzie lacked standing to challenge the determination of the boundary by the district court. The district court's order is affirmed.

### I

This case arises from a longstanding dispute over the division of the estate of Sam Catron Jr., the brother of Catron and the half-brother of Yazzie. Sam Catron Jr. died without a will, leaving an estate consisting solely of a grazing permit for twenty sheep units that he had received as a gift from the parties' father, Sam Catron Sr. The division of the estate of Sam Catron Sr., which consisted entirely of an agricultural use permit, was made according to his will and is not an issue in this appeal.

The district court's most recent order, appellant's opening argument at trial, and both appellate briefs characterize this case as a dispute over the estate of Sam Catron Sr. However, the district court's Stipulation, Agreement, and Orders (Agreement), filed by the parties on May 7, 1982, clearly established that Sam Catron Sr. gave away his grazing permit before dying. The dispute in this case arose from the intestate distribution of Sam Catron Jr.'s share of that grazing permit following his own death. The estate of Sam Catron Sr. is not at issue.

When the parties filed the Agreement in 1982, they intended to resolve disputed issues in the distribution of both estates. The Agreement divided the agri-

cultural use permit conveyed in the will of Sam Catron Sr. equally between the parties and directed them to obtain a survey confirming the boundary dividing the area. It also divided Sam Catron Jr.'s twenty-unit grazing permit, giving seven units to Yazzie and thirteen units to Catron. Finally, the agreement divided the customary use area which Sam Catron Jr. had shared with Yazzie at the time of his death and established the boundaries of the portion that would pass to Catron for his grazing use area. The district court approved the agreement and issued an order directing the parties to file their respective permits, surveys, designated land use areas, and fencing applications necessary to implement the Agreement within 90 days. Neither party complied with the order.

On April 10, 1987, Yazzie filed a motion to terminate Catron's rights to the grazing and agricultural use permits divided by the Agreement. On May 31, 1989, following a hearing, the district court directed the Bureau of Indian Affairs Branch of Land Operations, assisted by the District 18 Grazing Committee, to prepare a survey of the grazing area to determine the boundaries established by the Agreement. The court noted that all other disputes arising out of the Agreement had been resolved.

The Bureau of Indian Affairs was unable to complete the survey and instead submitted an interpretation of the Agreement made using an aerial photograph. Yazzie objected to the BIA's interpretation and on February 20, 1991, the district court held a final hearing to resolve the dispute. At the time of the hearing (and this appeal) only the eastern boundary of Catron's grazing area was in dispute. Paragraph 33 of the Agreement stated that, "The eastern boundary line of the Edward Nelson Catron designated grazing area would be designated as the western side, existing at this moment in time, of an arroyo which passes along the Black Rock immediately west." Yazzie argued that the Black Rock in question was roughly one and a half miles southwest of the agricultural use area and not the one immediately adjacent to it as argued by the BIA and Catron.

Use of the wrong Black Rock, she argued, would expand Catron's grazing use area to encompass her children's homesite leases. In reaching its decision, the district court relied on the text of the Agreement and heard testimony from the BIA, Catron's attorney at the time of the Agreement, Yazzie and two of her children. The court established the eastern boundary of Catron's grazing use area as the existing livestock grazing management unit fence almost parallel to the first arroyo located west of the Black Rock closest to the area in question. This boundary conformed with neither party's position, but used the Black Rock preferred by Catron. The district court further ruled that the grazing use area would exclude all existing homesite leases within the area's boundaries and that the right of egress and ingress to the homesite leases would not be obstructed.

# II

The May 7, 1982 Agreement between the parties, while ambiguous in some of its terms, clearly settled a number of issues. First, it divided Sam Catron Sr.'s agricultural use area equally between the parties and established the boundary between each one's half. Agreement at 8. Second, it established a line dividing the customary use area previously shared by Yazzie and Sam Catron Jr. into two separate grazing areas, one for the estate of Sam Catron Jr. and one for Yazzie. Agreement, paragraphs 21 and 22 at 6, paragraph 30 at 9. This line, in turn, was designated as the northern boundary of Catron's grazing use area. The southern and western boundaries were designated as the existing range management fence. Agreement, paragraphs 31 and 32 at 9. The northern, southern and western boundaries are not in dispute. Finally, the Agreement divided Sam Catron Jr.'s grazing permit, giving Catron thirteen sheep units and Yazzie seven. It provided that Catron's units were to be grazed on the land designated by the Agreement as his grazing use area while Yazzie's were to be added to her existing permit. Agreement, paragraph 36 at 10. The only issue in dispute at the time of this appeal (and the latest two district court hearings) was the location of the eastern boundary of Catron's grazing use area.

In *Estate of Wauneka Sr.*, this Court discussed the difference between private ownership of land, usually off the reservation, and use and occupancy of reservation land traditionally inhabited by a person's family, known as a customary use area. 5 Nav. R. 79, 81 (1986). The great majority of the Navajo reservation is trust land, including the area in dispute. Trust land cannot be owned by individuals outright ("in fee") the way land is owned off the reservation. Rather, the actual title to trust land is held by the United States government in trust for the Navajo people. The Navajo people use trust land for livestock grazing, agriculture, homesites, herb gathering, and sacred purposes. The Navajo Nation government grants permits for agricultural use within irrigation project areas and for livestock grazing across the reservation. It also grants homesite leases throughout the Navajo Nation. Navajos use their customary use areas for small agricultural plots, homesites, and grazing.

Livestock grazing is not allowed on Navajo trust land without a valid grazing permit. 3 N.T.C. § 781. Such a permit allows its holder to own livestock and to graze that livestock on Navajo trust lands to which he or she has use rights. No one can hold a grazing permit unless he also holds use rights to land sufficient to support the livestock authorized. A grazing permit alone does not give its owner the right to use land. A permit holder must also have use rights to a particular piece of land in order to keep and exercise his or her permit. Such rights are most frequently held as a customary use area on land occupied by the permit holder's family in previous generations. A grazing permit can be sold, inherited or otherwise transferred and can be sub-leased to anyone eligible to receive it through inheritance. All such transfers and subleases are subject to the approval of the

District Grazing Committee and the Agency Superintendent. 3 N.T.C. § 784, 786. Unless a Navajo has a grazing or agricultural use permit, a homesite or business lease, or rights to a customary use area, he or she has no rights or interest in trust land beyond those of every other member of the Navajo Nation.

The Agreement's description of the decedents' rights to land is consistent with Navajo land use. Regarding Sam Catron Sr., the Agreement states, "He has no other entitlement to land, such being contingent upon the grazing permit, which is an entitlement to use the surface of a designated area for the grazing of livestock...." Agreement at 5. Similarly, "the Grazing Permit of Sam Catron, Jr. entitled [him to] the use of the surface rights of the customary use area." Agreement, paragraph 21 at 6. When Yazzie made the Agreement, she accepted the division of the customary use area she had shared with Sam Catron Jr. before his death and the separation of her own customary use area from his estate's. When Yazzie agreed to add her seven units of Sam Catron Jr.'s grazing permit to her already existing 140-unit permit being used on her customary use area, she ceased to have any rights to his share of the customary use area they had previously shared. Without grazing rights to it, she had no interest in his share of the customary use area. Of the two parties, only Catron, to whom the Agreement gave thirteen units, had rights to Sam Catron Jr.'s share of the customary use area. The Agreement established a boundary between Yazzie's share of the customary use area and Sam Catron Jr.'s share. That boundary was declared the northern boundary of Catron's grazing area and became the southern boundary of Yazzie's. Yazzie gave up any rights she may have had to a share of Sam Catron Jr.'s portion of the customary use area. Those rights became Catron's.

Yazzie claimed at trial that she opposed Catron's interpretation of the grazing area boundary because if it was adopted she would have nowhere to exercise the seven unit grazing permit she had received from her brother's estate. However, Yazzie never claimed nor presented any evidence that her share of the customary use area was insufficient to support seven sheep units in addition to the 140 units she was already grazing. In fact, she had already agreed to add her inherited units to her existing grazing permit, now used north of the area in dispute. Having done so, she lost her standing to contest the boundaries of Catron's customary use area before the district court. Yazzie would not have received any additional use rights if her proposed boundary had been adopted, nor did she lose any when the court adopted the boundary it did. She has no standing to interfere in a matter in which she has given up her interests.

Yazzie argued in her brief that according to Anglo-American contract law the boundary should be set according to the "plain meaning" of the Agreement. In this case, however, Yazzie had no right to contract with Catron over the latter's grazing area. Thus, the determination of the boundary was a matter between Catron, the District 18 Grazing Committee, and the district court. 3 N.T.C. § 708. Yazzie, like any other Navajo in the community, had the right to express her opinion on the location of the boundary, but that right did not extend to con-

tracting with Catron to override the grazing committee's or the district court's determination of the proper boundary nor to bringing an action challenging that determination.

In reality, Yazzie may have pursued this action to protect her children's home-site leases which are within the district court's boundary of Catron's grazing area. The court, however, made provisions for those leases, ruling that valid homesite leases are excluded from the grazing area and are guaranteed free access by the leaseholders. Failure to obtain the agreement of Catron to such leases prior to this decision shall not affect their validity.

## III

We base our decision in this case on Yazzie's lack of standing to challenge the boundary of Catron's share of the customary use area. However, even if we had chosen to base our decision on a review of the district court's interpretation of the Agreement, we would have affirmed its determination.

This dispute has gone on for more than a decade. Like many land disputes, particularly among family members, it has been both complicated and emotional. It would have been better addressed in a non-adversarial proceeding more consistent with Navajo tradition, such as is available in the Peacemaker Court. Nonetheless, the district court reached its decision only after careful consideration of the facts as shown by testimony and documents introduced at the hearing. The district court is in a far better position to evaluate the evidence in such cases than we are. Therefore, unless the district court's decision was clearly erroneous or not supported by the facts proven, it should be affirmed.

The dispute in this case hinged on which black rock and accompanying arroyo were referred to in the May 2, 1982 Agreement between the parties. The trial court implicitly rejected Yazzie's claim that the black rock referred to was approximately one to one and a half miles south of the range management fence which forms the undisputed southern boundary of Catron's grazing use area. Instead, based upon testimony from the area's Bureau of Indian Affairs Natural Resources Manager and Catron's attorney at the time of the Agreement, the court found that the natural landmark used to establish the grazing area's eastern boundary was the Black Rock adjacent to Catron's agricultural use area and nearest to the Red Lake dam. It relied on paragraph #35 of the Agreement which specified the size of the grazing use area and corresponded with the size of the area reached using Catron's preferred black rock to establish the boundary. While the district court may have been interpreting the Agreement to establish the eastern boundary, the Agreement was also evidence of the parties' knowledge and understanding of the boundaries of the customary use area belonging to the estate of Sam Catron Jr. The court rejected the claim that using the Black Rock next to the agricultural use area to establish the boundary would deprive Yazzie of the use of her seven unit permit, finding that she could add those units to her existing permit.

In choosing the rock closest to the area in dispute to establish the boundary, the district court selected a natural landmark which parties involved in the drafting of the Agreement and familiar with the history of the vicinity's land use testified was appropriate. By setting the boundary as the fence line running along the west side of the arroyo, it chose a particular line on the "western side, existing at this moment, of an arroyo which passes along the Black Rock." (Agreement, paragraph #33). The Court did not contradict the language in the Agreement, but interpreted it in a way that was consistent with Navajo law. Land cannot be withdrawn for two purposes simultaneously. *Yazzie v. Jumbo*, 5 Nav. R. 75, 76 (1986). Using the existing range management fence as the boundary separates the grazing area from the agricultural area and allows efficient use of each. The district court's decision was consistent with Navajo law and supported by the facts presented.

The order of the district court is AFFIRMED.